FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

99 MAR 31  PM 12: 02

U.S. DISTRICT COURT
N.D. OF ALABAMA

FIRST NATIONAL BANK OF FLORIDA,       )
                                      )
        Appellant,                    )
                                      )
v.                                    )       Case No: CV-99-PT-226 S
                                      )
SHARKTOOTH DESTIN, INC.,              )
                                      )
        Appellee.                     )
                                      )

ON APPEAL FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

ENTERED

MAR 31 1999

IN RE:                                )
                                      )
SHARKTOOTH DESTIN, INC.               )       Case No: 98-83425-JAC-11
                                      )
                                      )

## MEMORANDUM OPINION

### I. History of the Case

First National Bank of Florida ("FNB") appeals from the Order of the United States Bankruptcy Court for the Northern District of Alabama, Northern Division dated December 10, 1998.

On September 8, 1998, Sharktooth Destin, Inc. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. in the bankruptcy court for the Northern District of Alabama, Northern Division. On October 5, 1998, FNB filed a motion seeking a change of venue in the Debtor's bankruptcy case ("Venue Transfer Motion"). The motion sought an order of the bankruptcy court determining that, according to 28 U.S.C. § 1408, venue was not proper in the Northern District of Alabama because the Debtor's "principal place of business" for the 180 days prior to filing was in the Northern District of Florida rather than in Alabama or, alternatively, that venue of the Debtor's case should be transferred "in the interest of justice or for the convenience of the parties" to the Northern District of Florida

pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014. On October 29, 1998, Gerald Cruz ("Cruz"), Alice Miller ("Miller") and Gerald Cruz Associates, Inc. ("GCA"), creditors and shareholders of the Debtor, filed a motion joining them in the Venue Transfer Motion (note that Cruz and Miller are also directors of the Debtor corporation). The Bankruptcy Administrator did not object to FNB, Miller, Cruz, and GCA's attempt to obtain a transfer of venue.

The bankruptcy court heard the Venue Transfer Motion on December 9, 1998. During the hearing, the Debtor argued that the present venue was proper because its "principal place of business" during the 180 days before filing was in the Northern District of Alabama where the Debtor's management decisions were allegedly made by the Debtor's vice-president and secretary/treasurer William Noojin ("Noojin"). On December 10, 1998, the bankruptcy court issued its Order denying the motion. In denying the motion, the bankruptcy court relied on the Seventh Circuit Court of Appeals' decision in In re Peachtree Lane Associates, Ltd., 150 F.3d 788 (7th Cir. 1998), stating at the hearing "the court believes that the Peachtree case clearly gives precedent, although . . . it's not an Eleventh Circuit case." The bankruptcy court found, based on Peachtree, that the Debtor's "principal place of business" was in the Northern District of Alabama because Noojin "actually runs the restaurant, runs the company, makes the major management decisions of the company, [and] hires and fires the consulting company that runs it . . ." from Huntsville, Alabama. Thus, the bankruptcy court concluded that venue in the Northern District of Alabama was proper for the purposes of 28 U.S.C. § 1408. The bankruptcy court further held that a transfer of venue pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014 was not required in the interest of justice or for the convenience of the parties.

Appellant FNB has appealed the bankruptcy court's ruling on the Venue Transfer Motion and contends that the bankruptcy court erred in holding that the Debtor's "principal place of business," for purposes of the Venue Statute was in the Northern District of Alabama during the 180 days prior to the Debtor's filing date. FNB also continues to maintain that, even if venue is proper under the express provisions of § 1408, the Debtor's bankruptcy case should be transferred to the Northern District of Florida pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014.

## II. Factual Background

The Debtor commenced its bankruptcy case on September 8, 1998. The Debtor is a corporation formed under the laws of the State of Texas whose sole business is the operation of the Sharktooth Island

Brewery and Grill ("the Restaurant") located in Destin, Florida. All of Debtor's revenues are generated in the State of Florida. All of the Debtor's assets are located in Florida, as were Debtor's bank accounts during the 180 day period before filing. The Debtor has liquor, food and brewery licenses issued by the State of Florida. The Debtor is party to a Groundlease Agreement dated July 1996 and various assignments of the Agreement with Destin/Sharktooth Limited Partnership, pursuant to which the Debtor leases real estate in Destin, Florida upon which the Restaurant is located. The Debtor is qualified to do business in Florida and maintains its books and records in both Destin, Florida and Huntsville, Alabama. The Debtor has no assets in the State of Alabama and is not qualified to do business in Alabama.

Out of a total of sixteen creditors identified in the Debtor's Bankruptcy Schedules filed on September 8, 1998 and its Amendment to Schedule F filed on September 24, 1998, six are located in Florida, seven are located in Texas, and only two are located in Alabama. The Florida creditors include the landlord under the groundlease and FNB, the Debtor's largest creditor and holder of a lien on the Debtor's interest in the lease and on all of the Debtor's assets. The Alabama creditors include FJC Growth Capital Corporation ("FJC"), a shareholder of the Debtor and insider under 11 U.S.C. § 101(31)(B), and the Debtor's former Alabama law firm.

On or about September 8, 1998, the Debtor filed its application in the bankruptcy court to employ Cobb Investment Company as professional manager of the Restaurant. Cobb's office is located in Destin, Florida. The Debtor had engaged Cobb to manage the business's day-to-day base-level operations and to provide financial and strategic advice seven months prior to the filing date to run the Restaurant.

The Debtor's Chapter 11 petition stated that the Debtor's "principal place of business" for the relevant time period was in Madison County, Alabama and that its address was 200 Westside Square, Suite 340, Huntsville, Alabama 35801 (the "Huntsville Address"). The Debtor does not own any real property located at the Huntsville Address, nor any real property in Madison County. The Huntsville Address is the address of FJC, one of the Debtor's shareholders, and is also the location of William Noojin's office.

William Noojin, as stated above, is the vice-president and secretary/treasurer of the Debtor corporation. Noojin is also vice-president and general manager of FJC. Noojin is not compensated by the Debtor for his role in its operation, and estimates that he spends, on average, between 45 minutes and five hours per workday on matters concerning the Debtor. Noojin lives and works in Huntsville, Alabama, but

travels to the Northern District of Florida as necessary to address matters related to the Debtor's business operations. Noojin, in his role as vice-president and secretary/treasurer, has authority to make major business decisions for the Debtor and is responsible for the Debtor's decisions regarding financing and bankruptcy. He is also involved, to some degree, in decisions affecting the day-to-day operations of the business, such as the hiring and firing of important employees and the content of the Restaurant's menu.

## III. Venue Provisions of 28 U.S.C. § 1408

Section 1408 of Title 28 of the United States Code provides that a bankruptcy case may be commenced in the district court for the district:

> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one hundred and eighty day period than the domicile, residence, or principal place of business in the United States, or principal assets in the United States of such person were located in any other district; or
>
> (2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408. Subsection (2) of the statute is inapplicable here, as no affiliated companies of the Debtor were subject to bankruptcy proceedings in Alabama as of the filing date, no general partner of the Debtor was involved in such a case, and no partnership of the Debtor was subject to bankruptcy proceedings. Venue in a Chapter 11 case under subsection (1) of the statute is proper in either the district where the debtor company has had its "principal place of business" for the previous one hundred and eighty days or where the debtor's "principal assets" have been located for the same time period. In re Commonwealth Oil Refining Co., 596 F.2d 1239, 1241 (5th Cir. 1979), cert. denied 444 U.S. 1045 (1980); Fed.R.Bankr.P. 116(a)(2) (predecessor of 28 U.S.C. § 1408 providing for venue in the judicial district "where the debtor has 'had its principal place of business or its principal assets for the preceding [six] months . . .'"; section 1408 did not become effective until 1984). Domicile and residence are not involved in this case, as such grounds for venue only apply to individuals. In re Suzanne DeLyon, Inc., 125 B.R. 863, 866 (S.D.N.Y. 1991). The parties in this case both acknowledge that all of the Debtor's assets are located in the Northern District of Florida and, therefore, that venue would be proper in that district under the "principal assets" prong of subsection (1). The parties disagree, however, on whether or not the Debtor's "principal place of business" is located in Florida or

Alabama for purposes of the statute.

## A. "Principal Place of Business" Under 28 U.S.C. § 1408

The location of a debtor's "principal place of business" for purposes of 28 U.S.C. § 1408 is a question of fact. In re Commonwealth Oil Refining Co., 596 F.2d 1239, 1241 (5th Cir. 1979), cert. denied 444 U.S. 1045 (1980); In re Industrial Pollution Control, Inc., 137 B.R. 176, 180 (Bankr. W.D. Pa. 1992). The party challenging the venue chosen by the debtor bears the burden of establishing by a preponderance of the evidence that the chosen venue is improper. In re Peachtree Lane Associates, Ltd., 150 F.3d 788 (7th Cir. 1998); see also Commonwealth Oil, 596 F.2d 1239, 1241 (5th Cir. 1979); In re Manville Forest Prod. Corp., 896 F.2d 1384, 1390-91 (2nd Cir. 1990). Due to the factual nature of the inquiry, the finding of the bankruptcy court as to the location of the debtor's "principal place of business" will not be disturbed absent a finding that the bankruptcy court's ruling was clearly erroneous. Commonwealth Oil, 596 F.2d at 1247; In re Guarantee Acceptance Corp., 544 F.2d 449, 452 (10th Cir. 1976); Bankr.R. 8013.

### 1. Commonwealth Oil Analysis

The Eleventh Circuit Court of Appeals has never squarely addressed this matter. The Fifth Circuit's decision in Commonwealth Oil is the only Appeals Court case involving this issue that is controlling in this circuit. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981); Fifth Circuit Court of Appeals Reorganization Act of 1980. In Commonwealth Oil the parties agreed that the debtor's principal assets were located in Puerto Rico – outside the venue where debtor filed his bankruptcy case. The debtor, however, claimed that its "principal place of business" was in San Antonio, Texas, where the company maintained its executive offices and managed the operations in Puerto Rico. In determining whether venue was proper in Texas, the Fifth Circuit examined the history of the venue statute as it related to the "principal place of business" provision:

A history of the Chapter XI venue provision is essential to an understanding of the meaning of principal place of business. Prior to the adoption of the current Chapter XI venue provision in 1973, Section 2(a)(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), limited venue for Chapter XI cases to the corporation's principal place of business. Chapter X of the Bankruptcy Act, on the other hand, allowed for venue in both the district where the corporation maintains its principal place of business or its principal assets. Rule 116(a)(2) changed the Chapter XI venue provision to conform to Chapter X's standards. The change is significant for at least two reasons. First, it sheds some doubt on the validity of old case law construing Chapter XI's prior venue statute. Second, the change indicates an intent to expand the districts where a Chapter XI debtor may file by appreciating the fact that a

debtor's principal place of business is not necessarily at the same location as its principal assets.

. . .

Since the adoption of Rule 116 it is no longer necessary to choose between the places of production and management. The emphasis of earlier decisions on the location of the debtor's production facilities is no longer appropriate because the location of the debtor's principal assets is now an independent basis of venue. Although relevant to an inquiry into a debtor's principal place of business, the change in Rule 116 has greatly diminished its significance.

. . .

Allowing venue in the district where a debtor manages its business is particularly appropriate in both Chapter X and Chapter XI cases. A corporate arrangement or reorganization is primarily a financial proceeding. The debtor is maintained as a going enterprise and its finances are put back in order. Where the corporation transacts its corporate business is a logical place for venue in such proceedings.

Id. at 1244-45. The court examined the extent to which the debtor corporation managed its business from the

Texas location, finding that:

(1) the vast majority of the corporation's officers and management personnel lived and worked in San Antonio;

(2) the corporation used "Operation Plans" created by management in Texas providing detailed production schedules;

(3) some authority to determine production levels was delegated to the facility personnel in Puerto Rico;

(4) the financial "heart" of the corporation was located in Texas, where the comptroller and treasurer worked to manage the corporation's bank accounts, expenses, tax accounting and preparation, and payroll matters, and where copies of the corporation's books and records were kept (copies were also kept in Puerto Rico according to Puerto Rico law);

(5) only a vice-president based in Texas had the authority to bind the corporation to sales agreements involving residual fuel oil, personnel in Virginia conducted most of the negotiations involving sales of gasoline, and personnel in Texas managed the sale of the corporation's petrochemical products;

(6) sales were negotiated at a number of locations, sometimes from the corporation's Virginia offices, sometimes from Texas, and sometimes from the offices of the customer.

The court found, after considering all of the above factors, that the corporation's production was

centered in Puerto Rico, but that the management of the corporation was centered in San Antonio. Based on

that conclusion, the court found that the bankruptcy court was not clearly erroneous in finding that the

corporation's "principal place of business" was located in Texas:

Our review of [the debtor's] corporate structure demonstrates that it manages most of its affairs from San Antonio. The feedstocks for its facilities are purchased by people working out of the

San Antonio office. The transportation of raw product to Puerto Rico is arranged from San Antonio. The operation of the refineries is directed from San Antonio. The sale of its refined products is managed from Virginia, and the sale of petrochemicals is managed from San Antonio. The people who deal with the Department of Energy and other federal agencies are stationed in San Antonio. On these facts, we conclude that the bankruptcy court was not clearly erroneous in locating [the debtor's] principal place of business in San Antonio.

. . .

As already indicated, the location of a debtor's assets is not particularly significant since the adoption of Rule 116 [section 1408]. The location of employees is, of course, tied to the location of assets. Many more workers are needed to run a refinery than to manage one. The district court mentions the physical location of [the debtor's] customers but does not give sufficient consideration to where the sales are negotiated and who in the corporate structure is charged with sales responsibility. Where the invoices are prepared is significant, but where [the debtor] pays its bills is of equal importance. The office of the comptroller and treasurer is located in San Antonio. The other factors mentioned by the district court, location of records, where audits are performed, directors' and stockholders' meetings are held, and the location of [the debtor's] current litigation are all relevant factors, but the inquiry should not have stopped there. . . The district court should have considered that management of all aspects of [the debtor's] business emanates from San Antonio.

Id. at 1244-48 (footnotes omitted).[1]

A number of district courts and bankruptcy courts have, based on the Fifth Circuit's language in Commonwealth Oil, held that an entity's "principal place of business" in the bankruptcy context is the place where its "major business decisions" are made. See, e.g., In re Peachtree, 150 F.3d at 795; In re Vienna Park Properties, 120 B.R. 320, 327-29 (Bankr.S.D.N.Y. 1990), vacated on other grounds, 125 B.R. 84 (S.D.N.Y. 1991); In re Sundance Corp., 84 B.R. 699, 700-01 (Bankr.D.Mont. 1988); In re Landmark Capital Co., 19 B.R. 342, 347 (Bankr.S.D.N.Y.), aff'd, 20 B.R. 220 (S.D.N.Y. 1982). As stated above, the bankruptcy court relied almost exclusively on the Seventh Circuit's Peachtree decision in determining that venue was proper in this case.

### 2. The Seventh Circuit's Peachtree Decision

Peachtree dealt with a set of facts much more closely related to the present case than did Commonwealth Oil. In Peachtree, the debtor was a Texas limited partnership which owned and operated a single asset – an apartment complex – in Texas. The debtor's day-to-day affairs were managed on-site by a California-based management company. Despite its obvious connections to Texas, however, the debtor filed

---

[1] It should be noted that the operations of Commonwealth Oil were much more expansive and extensive in general than those of the Debtor in this case. Further, the operations in San Antonio were much more extensive than those of the Debtor in Huntsville.

suit in Illinois bankruptcy court against several Texas defendants. The Texas defendants moved to transfer venue of the entire bankruptcy case to Texas, alleging that Texas represented the corporation's "principal place of business". The debtor claimed Illinois as its "principal place of business" by virtue of the fact that the debtor was controlled, through a series of upstream limited partnerships and corporate entities, by a company headquartered in that state. The Illinois company dictated the Texas limited partnership's debt restructuring, asset sale, and bankruptcy-related decisions. Peachtree, 150 F.3d at 790-92.[2]

The bankruptcy court in Illinois denied the Texas defendants' motion to transfer, finding that, although the debtor's day-to-day operations were managed in Texas, the company's major business decisions were handled by the Illinois entity. The court, therefore, concluded that the debtor's "principal place of business" was located in Illinois. The Seventh Circuit, relying heavily on Commonwealth Oil, agreed, stating:

> Like a number of bankruptcy and district courts, we find Commonwealth Oil's discussion of the issue persuasive. We are in agreement with the Fifth Circuit that the 'most important, consequential, or influential' place where a corporation or partnership does its business is likely to be the place where its management decisions are made. This focus on the location of the entity's decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-to-day operations.

Id. at 795 (citations omitted)(emphasis added).

### 3. "Major Business Decisions" Doctrine

The portion of FNB's initial appellate brief addressing the "principal place of business" issue states: "The place where the debtor makes its major business decision is its principal place of business for purposes of 28 U.S.C. § 1408." FNB cited Peachtree and In re Industrial Pollution Control, Inc., 137 B.R. 176, 180 (Bankr.W.D.Pa. 1992), two cases from outside of this circuit, as support for this proposition. FNB claims that the debtor's own statements acknowledge that the "major business decisions" concerning the corporation are

___

[2] Apparently no issue had been raised as to venue by any other creditor or otherwise until the debtor in Peachtree filed an adversary action against the Texas defendants. Further, the Peachtree court noted that: "This focus on the location of the entity's primary decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-today operations." Peachtree, 150 F.3d at 795. It would appear here that the day to day operational decisions will be more significant than financial decisions if Debtor is to continue in business. In re Guarantee Acceptance Corp., 544 F.2d 449 (10th Cir. 1976).

made by Cobb at the Florida situs. In its application to employ Cobb as a professional manager during bankruptcy, the debtor wrote: "Since taking over the management [in February 1998] Cobb . . . has reversed the fortunes of the Debtor far beyond expectations, and made it a viable entity. Cobb . . . has improved the quality of service and food, improved the attractiveness of the facility, improved relations with trade creditors, opened a successful nightclub on the premises, and implemented marketing and other strategies designed to made the Debtor highly competitive." Cobb's duties were described in the application as "the general management of the Restaurant, performing accounting and monthly reporting services, preparing tax reports and returns, giving the Debtor advice on financial matters and strategies for the Restaurant, and performing other management services which may be necessary. . ."

FNB argues that, in addition to having expressly acknowledged Cobb's predominant role in management, the Debtor, in signing a General Security Agreement dated January 27, 1997, represented to FNB that its "chief place of business" was in Florida. Additionally, section 10-2d-15-01(a) of the Alabama Code states that a "foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State." FNB contends that the Debtor's failure to qualify to do business in the State of Alabama, given the language of the statute, indicates that the Debtor never considered itself, prior to filing for bankruptcy, to be doing business in Alabama. Further, FNB claims that, because Mr. Noojin made relatively frequent visits to Florida to negotiate with the bank regarding the corporation's debt and to deal with other business matters, to the extent that he was involved in making major business decisions for the Debtor, such decisions were likely made in Florida. FNB also points out that Mr. Noojin's mere residency in Alabama is insufficient to establish a "principal place of business" for venue purposes.

### 4. Debtor's "Major Business Decisions" Argument

The Debtor concedes that Cobb provided it with advice regarding financial matters and business strategies and handled general management, accounting and monthly tax and financial reporting services. However, the Debtor argues that the undisputed evidence indicates that Noojin made the major business decisions of the Debtor and, in fact, makes many of the non-major decisions. Noojin was involved in the business on a day-to-day basis, spending 45 minutes to 5 hours per day on matters related to the Restaurant. He received reports and figures on a daily basis, was directly involved in managerial hiring and firing decisions, and had the power to hire/fire Cobb. Cobb's exclusive role in the hiring and firing of employees, on the other

hand, was limited to "lower rung" employees such as cooks and servers. Any changes or alterations in the Restaurant's menu must also be approved by Noojin. The power to renegotiate loans and make bankruptcy decisions clearly rested with Noojin. While Noojin did travel to Florida to engage in discussions with FNB and to deal with other Restaurant-related matters, FNB's conclusory allegation that he, therefore, must have made business decisions regarding the Debtor primarily while in Florida cannot be arrived at through any logical inference – such a conclusion simply does not follow from the evidence presented at the hearing or in the materials presented by FNB.

The Debtor points out a number of parallels between Peachtree and the present case. Both involved single asset bankruptcies in which a management company was hired to perform daily/routine management functions while the controlling entity/individual made "major decisions" from a different locale. The Peachtree court found that the state in which the more significant decisions were made represented the "principal place of business" of the debtor. Thus, according to the Debtor, to the extent that the court agrees with the method of analysis employed by the Peachtree court, the Debtor's "principal place of business" is located in Huntsville, Alabama and venue is proper in the Northern District of Alabama.

### 5. The Applicability of Peachtree and the "Major Business Decisions" Doctrine

In addition to having argued that the Debtor's major business decisions are not actually made in Alabama, FNB now argues that strict reliance on the "major business decisions" doctrine is improper and has resulted from courts misinterpreting the Commonwealth Oil analysis. Peachtree and those other cases applying the "major business decisions" standard have, according to FNB, placed too much significance on where an entity's daily operational decisions are made and, instead, chosen to look solely at the location of the corporation's highest decision-making authority. FNB points out that Peachtree, as a Seventh Circuit opinion, is not binding on this court and asks this court to look to the reasoning of Commonwealth Oil in deciding whether and to what extent to apply the "major business decisions" doctrine.

The Peachtree court's analysis, according to FNB, fails to recognize the significance of the location from which the debtor actually manages its ordinary course of business operations. According to FNB, the critical question surrounding the Commonwealth Oil court's analysis of the "principal place of business" issue is: "Where does the debtor primarily conduct and manage its business?" FNB argues that the Commonwealth Oil court's reasoning indicates a concern with the debtor's day-to-day management that is missing from the

Peachtree court's analysis and decision. FNB thus contends that, had the Peachtree court faithfully considered the factors deemed significant by the Commonwealth Oil court, it would have concluded that Texas was the debtor's "principal place of business" based on the day-to-day management decisions made at that location.

FNB argues that this case is nearly identical to In re Dock of the Bay, Inc., 24 B.R. 811 (Bankr. E.D.N.Y. 1982) and that, rather than following the reasoning of the Peachtree court, this court should apply the analysis employed by the Dock of the Bay court. In Dock of the Bay, the debtor was a Maryland corporation operating a chain of fast food restaurants located exclusively in Maryland. All of the corporation's employees, bank accounts, and assets were located in that state. The corporation's day-to-day operations were supervised by management in Maryland and the corporation's books and records were kept in Maryland. The debtor, however, filed in New York, claiming that state as its "principal place of business" because the debtor's president, who was also the corporation's sole stockholder, chief financier both before and during bankruptcy, and largest creditor, conducted his business in New York. The president claimed that he directed and supervised the debtor from his New York location and that New York's Eastern District was, therefore, the "nerve center" and "principal place of business" of the debtor. Id. at 813-14.

Several creditors move to transfer venue of the case to the United States Bankruptcy Court for the District of Maryland. The New York Bankruptcy Court held that Maryland, and not New York, was the debtor's "principal place of business", stating:

> Because corporations frequently do business in several jurisdictions, determining which constitutes the principal locus of such a corporation's activities has, at times, turned on where the direction and control of the enterprise rested, the so-called "nerve center" test. In re Hudson River Nav. Corp., 59 F.2d 971, 974 (2nd Cir. 1932); In re The Valley Fair Corp., 4 B.R. 564, 16 C.B.C. 586, 588 (S.D.N.Y. 1978). What Dock of the Bay is seeking to do is elevate a useful metaphor, "nerve center," into a substantive principle of law. Its position is that New York is the "financial heart" of the debtor's operations because it is the place from which Mr. Amentas directs and controls the company and provides financing.
>
> It is doubtful whether any of these activities singly or together constitute the "doing of business." Certainly, however, these straws cannot make New York, rather than Maryland, the place where the principal part of the debtor's business was carried on.
>
> What business Dock of the Bay did in the sense of generating income it did in Maryland: it was there that its restaurants were located; it was there that its employees worked; it was there that its books were kept; it was there that it incurred the debts that, apart from what it owed Mr. Amentas, have brought it into the bankruptcy court. The debtor earned no money in New York; it had no business address in New York; it had no telephone in New York; it received no mail in New York; it maintained no bank account in New York; anyone trying to find the debtor in New York would have had no success, except if by chance, it had visited the E.M.D. Construction Corp. and had seen the

debtor's name on the door.

. . .

     The conclusion that New York is not the debtor's principal place of business is based on the assumption that [the debtor's president]. . . gave control, direction, and financing to the debtor.

Id. at 814-15 (citing In re Maidman, 2 B.R. 569 (Bkrtcy.S.D.N.Y.1980), aff'd sub nom. Compass Investment Group v. Maidman, 668 F.2d 682 (2d Cir.1982), and In re The Valley Fair Corp., 4 B.R. 564, 16 C.B.C. 586, 588 (S.D.N.Y. 1978) as general support for the court's conclusion).[3]

     When applied to the facts of this case, the reasoning and analysis employed by the Dock of the Bay court appear to lead to the conclusion that the Debtor's "principal place of business" is located in Florida rather than Alabama. FNB thus argues that the mere fact that Mr. Noojin himself operates out of Alabama is not sufficient to establish a "principal place of business" for venue purposes.

---

[3] The Dock of the Bay court did not cite Commonwealth Oil in reaching its decision on the "principal place of business" issue.

    Like the Dock of the bay Court, some jurisdictions have recognized the value of the "nerve center" test in bankruptcy venue determinations, but have found that a bare bones determination that a given location represents the nerve center of a business does not automatically and irreversibly establish and determine venue in a bankruptcy case. See In re Great Lakes Hotel Associates, 154 B.R. 667 (E.D.Va. 1992); In re Lakeside Utilities, 18 B.R. 115 (Bankr.D.Neb. 1982). Cases such as Great Lakes and Lakeside Utilities allow bankruptcy courts, upon a finding that a location is the nerve center of the debtor business to, nonetheless, decide, based on an analysis of all of the related factors, that the "principal place of business" of the debtor lies somewhere else. Id. at 672. However, these cases do so with the recognition that no specific test should necessarily guide a court in its decision. The Great Lakes court therefore provided the bankruptcy court with considerable latitude in determining where the debtor's "principal place of business' was located.

    Some courts have expressly rejected the significance of the "major business decisions" or "nerve center" test for determining "principal place of business" for venue purposes. See In re EDP Medical Computer Systems, Inc., 178 B.R. 57 (M.D.Penn. 1995). However, those courts have usually done so based on the notion that "principal place of business" means the same thing in any given context. The EDP court's rejection of the nerve center test, for example, was based on the Third Circuit's rejection of that test in the context of the diversity jurisdiction statute in Kelly v. United States Steel Corp., 284 F.2d 850 (3rd Cir. 1960). However, the analysis used to determine "principal place of business' in the context of bankruptcy venue decisions is different, or, at a minimum, weighted differently, than the analysis used in diversity jurisdiction determinations:

    Where a bankruptcy action will focus on financial decisions and the formulation of a reorganization plan, the weight given factors which coincide with the "nerve center" analysis may be greater. Thus, the analysis of proper venue in bankruptcy cases is different than in diversity cases.

Commonwealth Oil, 596 F.2d at 1247 n.17.

### 6. Debtor's Commonwealth Oil Argument

The Debtor contends that the Commonwealth Oil analysis, standing alone, supports a finding that the "principal place of business" of the corporation in this case is in Alabama. Commonwealth Oil, as stated above, dealt with a corporate arrangement where the majority of the assets, employees, and production facilities were located in Puerto Rico. Nonetheless, the court found that the corporation's "principal place of business" was in San Antonio where the majority of the business's managers were located and where most of the management decisions were made. The Debtor points to the Commonwealth Oil court's recognition that a Chapter 11 proceeding is financial in nature and that "[w]here the corporation transacts its corporate business is a logical place for venue in such proceedings," claiming that the court's statement supports a finding that the state in which the significant management decisions are made represents a corporation's "principal place of business" for venue purposes. Commonwealth Oil, 596 F.2d 1239 at 1246.

Debtor asks the court to ignore the reasoning of the Dock of the Bay court, pointing out the fact that the case was decided by the Bankruptcy Court for the Southern District of New York and, consequently, is not binding in this circuit. Further, the Dock of the Bay court did not rely, to any extent, on the Commonwealth Oil analysis in reaching its conclusion.[4]

### IV. Transfer of Venue Under 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 1014(a)

FNB contends that, even if venue is proper in this case under 28 U.S.C. § 1408, the bankruptcy court erred in failing to transfer the case pursuant to the provisions of 28 U.S.C. § 1412 and F.R.B.P. 1014(a), which allow a transfer of venue in a bankruptcy case if such transfer is "in the interest of justice or for the convenience of the parties." "The court should exercise its power to transfer cautiously, and the party moving for the transfer must show by a preponderance of the evidence that the case should be transferred." Commonwealth Oil, 596 F.2d at 1241 (citations omitted).

"[I]f the convenience of the parties and witnesses will be served by transfer, it usually follows that justice will also be served by transfer." In re Pinehaven Associates, 132 B.R. 982, 989-90 (Bankr.E.D.N.Y.

---

[4] Both parties argue that In re Wilson, 154 B.R. 769 (Bankr.M.D.Ala. 1993), provides support for their respective "principal place of business" arguments. However, In re Wilson did not involve a "principal place of business" question, rather, that case involved the issue of whether a transfer of venue would be "in the interest of justice or for the convenience of the parties," under F.R.B.P. 1014(a).

1991). "The 'interest of justice' is a broad and flexible standard which contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness and fairness." In re Wilson, 154 B.R. at 771, quoting In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 149 B.R. 365 (Bankr.S.D.N.Y. 1993). In discussing the venue transfer provisions, the Commonwealth Oil court determined that the most significant factor in deciding whether transfer would further the convenience of the parties is "whether the requested transfer would promote the economic and efficient administration of the estate." 596 F.2d at 1247. Given the similarity between the Commonwealth Oil court's most important factor to be considered in the convenience analysis and the language used in In re Wilson to describe the "broad and flexible" interest of justice standard it would appear that, although the two considerations are "stated in the disjunctive [in the statute], the two factors considerably overlap." In re Wilson, 154 B.R. 769, 773 (Bankr.M.D.Ala. 1993).

The Commonwealth Oil court outlined six considerations for determining if a transfer would further the convenience of the parties:

(1) The proximity of creditors of every kind to the court;

(2) The proximity of the bankrupt (debtor) to the court;

(3) The proximity of the witnesses necessary to the administration of the estate;

(4) The location of the assets;

(5) The economic administration of the estate;

(6) The necessity for ancillary administration if bankruptcy should result.

596 F.2d 1247. Again, the most important of these factors is, according to the Commonwealth Oil court, "whether the requested transfer would promote economic and efficient administration of the estate." Id. Both parties suggest that a weighing of the six factors favors their position regarding transfer of this case.

In refusing to transfer venue pursuant to § 1412, the bankruptcy court recognized several inconveniences that would stem from keeping venue in Alabama, but suggested that those inconveniences were not overwhelmingly significant. The bankruptcy judge addressed the question of witness proximity and economy, stating:

[W]hat would be the hardship involved in this [case] being in Florida as opposed to here in Alabama? And one would be . . . valuation . . . you're going to have to have appraisers from [Florida]. The court

> is well aware of how expensive appraisers are . . . but then to have to bring them up here for two or
> three days to testify is [an added expense]. But are there not ways that we could avoid that? . . . Some,
> you could do it by deposition . . .

The bankruptcy judge also considered referring the valuation question to Florida courts, but noted that the expense and inconvenience of such a referral would outweigh any benefits. In further discussing witness proximity, the bankruptcy court confirmed that Cobb representatives were willing to travel to Alabama as necessary to appear before the court, and questioned who, other than FNB, would be benefitted by the transfer. The court went on to find that "the bank may have to send some representatives here at appropriate times, which would be inconvenient, but I think that is the main inconvenience, that and the appraisal issue. But other than that, I don't see how that there would be any impact about the daily operation of the restaurant." The bankruptcy judge also found that the fact that the Debtor was not qualified to do business in Alabama was unimportant in determining whether transfer is proper under § 1412, stating: "[Alabama is] its principal place of business, it's not doing business here, but its principals are here." The court, based on these concerns alone, and without clearly addressing the factors identified in Commonwealth Oil, denied the § 1412 change of venue motion. The parties have, however, addressed the factors as follows:

### A. Proximity of Creditors

Out of sixteen total creditors reported in the Debtor's bankruptcy schedules, six are located in Florida, seven are in Texas, and two are in Alabama. The two Alabama creditors are an insider and the Debtor's former law firm. The Florida creditors include FNB, the Debtor's largest creditor and the Debtor's landlord, of the Debtor's most significant asset, the Restaurant. FNB argues, apparently based on the primary importance of itself and the landlord as creditors, that the proximity of the creditors factor favors transfer of the case to Florida. The Debtor, however, argues that only FNB would be benefitted, so far as proximity is concerned, by a transfer. Transferring this case would, in the Debtor's view, set the standard for an unbalanced approach that would allow major creditors dictate the venue of bankruptcy cases. According to the Debtor, the Texas creditors are no closer to Florida than to Alabama, the insider creditors have no real proximity-based interest in a transfer, and the landlord's lease has been assumed by the Debtor and is being paid in full in a timely fashion thus, in the Debtor's opinion, relieving the landlord of any interest in the location of the bankruptcy. Further, the issues and concerns in this chapter 11 case have, according to the Debtor, been

reduced to those issues and concerns involving the Debtor and FNB.

### B. Proximity of the Debtor and Proximity of Witnesses

FNB contends that the majority of the Debtor's representatives, including Cobb and the Restaurant's employees, are located closer to the Northern District of Florida than to this court. The employee witnesses are, according to FNB, extremely important to a case such as this in that their testimony is critical to an assessment of the Debtor's day-to-day business affairs and the status of the Debtor's reorganization on an operational level. Because this court is more than 100 miles from such employees, it cannot compel their presence at hearings. Thus, FNB contends that the proximity of the employees of the Debtor to the bankruptcy court is extremely important to the court's ability to effectively and efficiently administer the case. Further, out of those witnesses who may be necessary for effective the administration of this case, such as appraisers and FNB employees and/or representatives, most, if not all, are located in Florida. FNB, citing In re Portjeff Development Corp., 118 B.R. 184, 194 (Bankr.E.D.N.Y. 1990)[5], contends that the need for local real estate appraisers weighs heavily in favor of transferring venue, especially in light of the fact that this case involves only a single asset. FNB also argues that the fact that Noojin frequently travels to Florida indicates that it would not be an inconvenient forum for him.

The Debtor points out that the one person authorized to act for the Debtor, Mr. Noojin, is located in Alabama. The Debtor stresses that it does not want the case transferred and argues that the location of its employees is unimportant. Noojin's presence at bankruptcy hearings will be required while the vast majority of the employees will, very likely, never be involved in the proceedings. Further, although representatives of Cobb will be involved in the hearings, Cobb representatives will appear in Alabama as needed and are aligned with the Debtor. The Debtor claims that there exists no inconvenience to FNB in bringing its own witnesses to Alabama from Florida when necessary and argues that there is no reason to assume that an Alabama court would not recognize the ability or accreditation of an appraiser who either is or is not from Florida or qualified in Florida.

___

[5] In Portjeff, the proximity of witnesses factor was held to weigh in favor of transferring venue to the district where the real estate was located in a case where the debtor's assets consisted primarily of real estate.

## C. Location of Assets

FNB, citing Portjeff and several New York other cases, argues that "where all of the debtor's assets are located in a single district, that factor overwhelmingly militates in favor of a transfer to that district." In Portjeff, the court transferred a Chapter 11 case pursuant to 28 U.S.C. § 1412 from the District of Connecticut to the Eastern District of New York where the debtor's only asset, a marina, was located. The debtor's only connection to Connecticut was the fact that its sole shareholder resided in that state. 118 B.R. 184. FNB goes on to argue that Portjeff, In re Oklahoma City Assoc., 98 B.R. 194, 199 (bankr.E.D.Penn. 1989), In re Slenz, 94 B.R. 446, 450 (Bankr.N.D.Ohio 1988), In re 19101 Corp., 74 (Bankr.D.R.I. 1987), and In re Eleven Oak Tower Ltd. Partnership, 59 B.R. 626, 630 (Bankr.N.D.Ill. 1986) all support the principle that venue should, in the interest of economical and efficient administration, remain close to the site of the debtor's principal asset. Given the fact that all of the Debtor's assets are located in Florida, FNB contends that this factor weighs very heavily in favor of a transfer.

The Debtor responds to FNB's contentions regarding the location of the assets by arguing that the bank should not be concerned so much with its proximity to the court as it should be with its proximity to the assets. FNB's access to the Restaurant, according to the Debtor, is the matter the bank should be concerned with. Such access, claims the Debtor, will not be influenced by a transfer.

The Debtor's response to FNB's argument on this factor is non-responsive. The argument simply contends that FNB should not be concerned about the location of the assets relative to the venue of the bankruptcy proceedings. However, the location of the assets in relation to the selected venue has been deemed by the Commonwealth Oil court to be a factor worth considering when determining whether a transfer is proper. At the same time, the Commonwealth Oil court found that, despite the fact the vast majority of Commonwealth Oil's assets were located in Puerto Rico, the bankruptcy court's finding that venue in that case was in the interest of justice and not overly inconvenient for the parties, was not clearly erroneous.

## D. Economical and Efficient Administration of the Estate

As the lease and loan documents involved in this case are subject to Florida law, FNB claims that Florida bankruptcy courts are in a better position, due to their familiarity with Florida law, to deal with matters concerning this case. FNB also contends that a bankruptcy judge sitting in the district where the Restaurant is located will have a better chance to evaluate the Debtor's prospects and ability to reorganize. FNB points

out that in In re Abacus. Broadcasting. Corp., 154 B.R. 682, 685-86 (Bankr.W.D.Texas 1993), the court recognized that it should take into account the extent to which a judge in the community in which the debtor's business operations are located might most effectively and efficiently administer the case and evaluate the debtor's chances for a successful reorganization.

The Debtor contends that because: (1) this case has been reduced to issues between itself and FNB; (2) the location of the assets has very little bearing on the administration of the estate; (3) FNB has not shown that transfer to Florida will result in a more efficient or economically reasonable administration of the estate for anyone but FNB; and (4) the decisions regarding financial reorganization will be made by the Debtor's representative in Alabama, Mr Noojin, economy and efficiency will be best served by keeping the case in Alabama. The Debtor argues that this case is similar to Commonwealth Oil in that the center of the financial reorganization effort will be where the leading decision-maker is located. Thus, argues the Debtor, as in Commonwealth Oil, the case should remain in the district where the offices of management are located.

## E. Necessity for Ancillary Administration in the Event of Liquidation

FNB argues that if this case is converted into a chapter 7 liquidation, it would be easier and more economical for a chapter 7 trustee in the State of Florida to manage the liquidation than it would be for an Alabama trustee. The bankruptcy court in this case confirmed FNB's position when, during the hearing, it stated: "If [the case is] converted, you could rest assured if I don't transfer it now, I will do it then . . ." FNB thus argues that this factor weighs in favor of a transfer. The Debtor claims that the bankruptcy court's willingness to transfer the case if and when converted alleviates any problems that might arise and that, while the case remains in chapter 11, this factor does not weigh in favor of a transfer.

## V. Court's Conclusion

While this court is of the opinion that the application of Commonwealth Oil to this case is marginal at best, the court does not decide the "principal place of business" issue, as such. The court having carefully considered all the "transfer in the interest of justice or for the convenience of the parties" factors set out in Commonwealth Oil, concludes that these factors weigh heavily in favor of transfer and that it was clearly erroneous for the bankruptcy court to find otherwise – all six factors weigh in favor of transfer. Furthermore, if the two argued issues are considered conjunctively, the total circumstances militate against venue in this district.

FNB will submit a proposed order, consistent with the court's stated conclusions, which will result in

a transfer of venue to the Northern District of Florida.

This 31st day of March, 1999.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE